Case number 223736, Novus Group LLC v. Prudential Financial Inc, et al. Argument not to exceed 15 minutes per side. Mr. Hart, you may proceed to the appellant. May it please the court and good morning. Jonathan Hart on behalf of Novus Group LLC. With me in the courtroom today are the founders of Novus, Eric Seabolt and Mark McHaney. So the court's apprised. I've reserved five minutes for rebuttal. We're here today because the district court committed two errors. First when it found that there was no fact issue as to whether former nationwide executives Lisa Farris and Rodney Branch had a duty to keep confidential Novus' confidential information they learned at Nationwide once they went to Prudential. And second, whether there is a fact issue as to Novus' alleged trade secrets because they do or do not derive independent economic value from their status as trade secret. I'm going to take them in that order. First of all, whether or not Ms. Farris and Mr. Branch had a duty to maintain this confidential information as secret really is premised on the facts of this case. And when you look at the district court's undisputed findings of fact, it's clear they did have that duty. And the error that the district court made was it ignored or misunderstood clear evidence that was right in front of it. First of all, the district court properly found that Nationwide and third-party Angen, which is a joint venture between Annexus and Genesis, had a nondisclosure agreement. The district court found as an undisputed fact that that nondisclosure agreement was focused on something called the New Heights Project. The NDA was between whom? You said they had one, but it had to be with somebody. Nationwide had a NDA between itself and a joint venture called Angen. So Nationwide is the other side of the NDA? There's several nondisclosure agreements we'll get through. This is the first one. The district court found that this nondisclosure agreement related to a project at Nationwide called New Heights that Angen was involved in. Does the agreement mention New Heights expressly? I don't recall if the agreement expressly mentions New Heights, but it's undisputed from the testimony of Nationwide employees that this agreement was focused and limited to the New Heights Project. That's the fact that the district court latched onto. The district court then concluded that Novus' project was unrelated to New Heights. That's where the error is. When you look at the evidence that was before the district court, this includes Exhibit 4 to the summary judgment briefing, Exhibit 5 to the summary judgment briefing, Exhibit 7. These are emails between the combination of Nationwide and Angen employees and also Nationwide and Novus principals about the Novus Project. They are expressly saying, we're sharing this Novus information with you. We want to talk to you about this Novus information. This is in conjunction with the New Heights Program. Which one was this? What was the time? When was this meeting? Was this the 2013 meeting? There's a series of meetings. This is important, so I want to give you a little bit of detail about it. First, the Novus founders had relationships with Nationwide. When they started their company, came up with their general concept in 2013, they approached someone they knew at Nationwide named Mike Maroney. Mike Maroney said, listen, we don't have a confidentiality agreement. You're just coming to me with a concept. I don't want to talk to you about this. You need to, at a minimum, go get it validated. The people that will validate, give you actuarial analysis to validate this, are at Annexus and Genesis. That's the two companies that make the Angen joint venture. That's exactly what Novus did. They went to these companies. They finalized the development of their product plan and the associated marketing strategies. They got the actuarial validation. They got actuarial pricings. They had everything packaged up. It was at this point, knowing that Angen had the relationship with Nationwide, that they collectively and initially, through Angen, went back to Nationwide and said, now we've got something we can present to you. Angen communicated to Novus that we have a confidentiality agreement with Nationwide. Novus was aware of that. Novus also took steps to maintain the confidentiality of its information by having its own agreements with both Genesis and Angen. It has its non-disclosure agreements there. It has been informed that Angen has its confidential relationship with Nationwide. That's also consistent with their understanding of Nationwide's dealings with Angen. At that point, this goes on for a while, but we're now... You're sort of saying you've got a three-cornered NDA, Novus with Angen, Angen with Nationwide. That's correct. It's within that context that this information begins to be shared. Angen, an individual named Eric Dunham, who's at Angen, has a contact with Mike Maroney and his team, and he begins sharing information with Nationwide. I have a timeline. When was this meeting? This email exchange should have been in 2014. These are Exhibits 4 and 5, I believe. Your friends on the other side would say they gave information to Maroney, sure, but they didn't give information to Branch or Ferris. It's just innuendo that Branch and Ferris somehow learned this information from Maroney and then used it when they went to Prudential. Except the record is more fulsome than that. What really happens is you have a situation where Maroney, Ferris, Branch all work together. Branch is the senior most, Maroney underneath that, Ferris underneath Maroney. In addition, the responsible parties at Nationwide for the Angen relationship are Maroney and Branch. So they're familiar with what's going on with the New Heights project overall. And then we have additional information. We know that there was meetings involving Mr. Branch where he had access to information about Novus' dealings. Now these were privileged meetings with lawyers evaluating this, but we know he had those meetings. We also know, although this is disputed as to, this is information on the privilege log. So we have inferences from the privilege log, is the best you have to say that this information was somehow gleaned by, I guess, Branch in that instance or Ferris? We have information on the privilege log that Branch had these meetings about Novus. What we don't know from the privilege log, obviously, is the specific discussions with the attorneys that took place in that meeting. What we also know... It's a lot. I mean, to me the case keeps coming back down to, it's at very best inference that Ferris or Branch had any access to this information. And usually in these cases it feels like the access is sort of not challenged, it's sort of whether it was a trade secret and how it was used. In other words, it's usually insiders of the company and they all know what each other knows and one leaves and uses the information. And it's sort of clear they all had access to it. That's not in question. Oftentimes it's just, what was the information and how valuable was it? In this case, we have some of the other parts, but we don't have the key ingredient, which is that the people you say misused the information actually had access to it. So we don't have a smoking gun. We don't have them leaving with a file. We don't have a USB disk that they took to Prudential, things like that. You don't have a meeting between them and Amgen, right? Don't have that either. We don't have a meeting between Amgen and those two individuals. Right. So you have a meeting between Amgen and Moroni. There are meetings and it's uncontested that there was a meeting involving Moroni's team with Mr. McCanny. The dispute there about that 2015 meeting is whether Lisa Ferris was at that meeting. But this is why it boils down to dispute. Because initially you said she wasn't and then later on you said she was? Initially the statement was that they did not know what specific information Lisa Ferris had and that's still true today. What changed during the course of discovery is that Mr. McCanny realized that she was, after he'd seen her at deposition for example, that she was in fact at that meeting with other members of Mr. Moroni's team. And regardless, I think it's a fact issue as to whether or not they would have had access to this because this is not opposite ends of the company. This is not some employees on the first floor and some on the eighth floor and trying to argue that somehow they all got access to the same information. These are all individuals that are working on the same projects, working together. And it's uncontroverted on this record that Lisa Ferris was the death benefits guru nationwide. Judge Boggs, do you have any questions? No, I'm good. Okay. I'll give you about time. Thank you. May it please the court, good morning. My name is Michael Sandinato, I'm with the Benable Firm, I represent the Apelli Prudential. With me is my partner, Josh Calabro, and my colleague, Rachel Rodman. Your honors, and Judge Riedel, you mentioned the term, the key ingredient, and in our opinion, this key ingredient, this question of whether Branch or Ferris ever received any information at all, trade secret or otherwise, is at the nexus of this case, the very center of this case. There was absolutely no evidence that they did. And that's important. As the court knows, the district court never decided that issue. The district court never decided that issue because it didn't think it needed to. The court said that it need not wade into that issue because regardless, there was no trade secret and no misappropriation here. But we think the fact that the absolute lack of evidence on the point of communication of any Novus information from Novus to Branch and Ferris underlies all of this. Branch testified that he had no recollection of Novus and no recollection of receiving Novus information. Ferris testified that she had no recollection of Novus, no recollection of receiving Novus information. Mike Moroney, the nationwide employee who did receive the Novus pitch, who did receive Novus information, testified that he acted as the gatekeeper and never gave the information to either Branch or Ferris. And importantly, Moroney was a nationwide employee. Moroney gave his deposition testimony pursuant to a subpoena issued by Novus. Prudential played no role in the preparation of Mr. Moroney and indeed asking little or few questions at the deposition. He was an independent third party witness who testified unequivocally that he was the gatekeeper and never gave information to Branch. So your friend on the other side has two things they point to. One is this privilege meeting where it appears that the company was discussed, maybe more specifics were discussed, and then the sort of late in the day recollection that Ferris was at a meeting with Amgen or Novus, I forget exactly who. So those seem to be the two things your friends on the other side put forward to suggest there's at least some fact question that should go to a jury. I'd be happy to address them both. First of all, the privilege log is a privilege log. It's not admissible evidence. A privilege log is a disclosure mechanism. Privilege log was produced by or given by Nationwide to Novus and it indicated that there were some emails and potentially a meeting to discuss Novus, but there's absolutely no information about what that meeting entailed. What's how privilege logs work? They don't disclose? Correct. They don't disclose information. Absolutely. And the privilege log is not created to be something that can be shown to a jury. The idea of a privilege log. Well, it's something but. Is that the same meeting that Moroni talks about in deposition? No it's not. No. The meeting that Moroni talks about in his deposition is a meeting that occurred, and this is undisputed, a meeting that occurred between Novus, at least Mr. McCanny from Novus, and Moroni. And what are the relative dates of the one in the privilege log and the one that's discussed by Moroni? The dates are somewhat close to one another. They're clearly two separate meetings. One of them we roughly know who was there and what occurred. The other one we simply know it was a meeting between who at least. It was an internal, internal Nationwide meeting. And it included lawyers or something? It wasn't our privilege log, Your Honor, but presumably it would have included, it would have included lawyers. I believe that's probably how the privilege log was made, but there was never any challenge. Okay. And beyond that, we have no information and no one was able to, that is, presumably they could have deposed Ferris and Branch. Did you go to a meeting on this date or approximately this date? There was a deposition of Branch, and Branch was shown the privilege log and he had no recollection of the meeting. Of any such meeting? No recollection of the meeting, no recollection of seeing the email. Okay. And there was no effort to, by your friends on their side, to ask the court to produce, have those documents produced in camera or some other way? There was no challenge to the privilege log whatsoever, and that is why this is not admissible evidence. This is not something that can be shown to the jury and leave the jury to guess or speculate what may have been discussed at the meeting. If it even occurred. Okay. And then the other? So then the second one is a purported meeting between Mr. McKinney and Lisa Ferris. And this was an 11th hour, in our view, fabrication on the eve of Mr. McKinney's deposition that he suddenly recalled a meeting where he met directly with Lisa Ferris and gave Lisa Ferris documents. And this is barred by judicial estoppel. During, in their complaint, in opposing our motion to dismiss, in interrogatory responses, Novus unequivocally said that they did not know how Branch or Ferris got the information. Not, as my colleague said, what information they were given, but how they got the information. That was something that the court relied on in denying our motion to dismiss and, in essence, allowing the case to proceed. I heard the word smoking gun during my president's remarks. In a lot of trade secret cases, there isn't a smoking gun. And usually the case is allowed to proceed to allow the plaintiff to find the smoking gun or to find evidence during the discovery process. That's what happened here. The court denied our motion to dismiss because Novus said, we don't know how Branch and Ferris got the information. Let us take discovery, in essence, and find out. The court relied on that representation, denied our motion, and then, in the 11th hour, Mr. McKinney suddenly remembered this meeting where he gave information directly to Lisa Ferris. That's not something that can be presented, that argument, that evidence is barred by judicial estoppel. They certainly are inconsistent, but it's also not completely unfathomable to think that someone's memory is jogged. I mean, there are a lot of meetings here, a lot of people. It's not beyond the pale to think that someone's memory could be jogged by seeing someone or some recollection or something like that. Well, I think it is in this case because we have evidence that Mr. McKinney knew who Lisa Ferris was and, indeed, knew what Lisa Ferris looked like even before the case was brought. There was a document created by Novus that had, and it was sort of a road map document of its case that I believe it probably used to obtain a lawyer in this case, and it produced it to us. And that document included not only Lisa Ferris' name, but Lisa Ferris' picture, an image of Lisa Ferris from her LinkedIn profile. So the notion that I saw Lisa Ferris at the deposition and suddenly remembered that this was the person I gave the document to, this was the person that I met with, is really contradicted by that document and by the fact that we didn't hear of this revelation until well after the Lisa Ferris deposition. So we do think that the record here contradicts any notion that this meeting took place or that he didn't remember the meeting. Any other questions on that point? With that, I'll jump in, if I may, to the issues that the district court did decide, the no trade secret issue and the no duty of confidentiality issue. And I'll start with the no duty of confidentiality issue because that was what was discussed during my brethren's remarks. And here we think it's pretty straightforward. There was no NDA or other agreement between Lisa Ferris and Novus. There was no NDA or other agreement between Rodney Branch and Novus. There was no NDA or other agreement between Nationwide and Novus. And indeed, Mike Moroney told Novus that it would not execute an NDA and that therefore no confidential information should be shared. Now, Novus tries to trivialize that point by arguing that that was told to them a year before the pitch was made. But Mike Moroney never repudiated that comment that no information should be shared. And of course, Nationwide never entered into an NDA or any other kind of agreement with Novus. These other agreements that Novus points to, first the Nationwide Annexus Genesis Agreement, Novus was not a party to that agreement. And Novus can't be a beneficiary of that agreement. And I want to point out here, Your Honor, is that the argument that the Tiber was pitched as a rider to new heights that Novus is now making was never made below. And so that issue is waived. In addition, so it's a factual issue that can't be considered for the first time on appeal. In addition, it's important to note here that the Trade Secret Act has two secrecy requirements. The first requirement comes from the definition of the trade secret itself. In order to be a trade secret, something needs to be subject to reasonable efforts at confidentiality. The second secrecy requirement of the trademark of the Ohio Trademark Statute is part of the definition of misappropriation. And that requires a duty.  Now, in the proceedings below, Novus never argued that there was a confidentiality relationship. All of its so-called secrecy or confidentiality arguments were directed at prong one, at whether or not this was a trade secret, whether or not Novus took reasonable efforts to maintain it as a trade secret. That's a different requirement. That's a requirement that stems from the definition of trade secret. It's different than what's in the definition of misappropriation. For there to be a misappropriation, there needs to be a duty. And Novus never made a duty argument. And therefore, that's waived. That's what the district court found in footnote 11 of the order, I believe. And that's what this court should find as well, that Novus cannot now present this duty argument for the first time on appeal. So now I'll jump into the no trade secret argument. That was another independent reason why the district court found that there was no case here, that there was no trade secret misappropriation here. Not just any information can be a trade secret. In order to be a trade secret, the information must derive independent economic value from not being generally known and not being readily ascertained. And because the Novus information was fully consumer-facing, the court here determined that there was no trade secret because it did not derive independent value from being known or from not being generally known or ascertainable. Of course, the key case here that the court applied was the Strombach case. That was a case that involved a poem and a screenplay. And in that case, the Sixth Circuit decided that there was no trade secret there because all value came from being disseminated, from being published. And the situation is exactly the same here. The Novus ideas are completely consumer-facing, and just like a play, they cannot derive value from secrecy. They have no value if they're kept secret. A classic trade secret would be something like a secret formula or a manufacturing process. Those are things that can be used, that can be utilized, that can be commercially exploited, while at the same time maintaining their secrecy. Something like a screenplay, something like these Novus ideas, which are largely marketing ideas of a financial product, cannot. As their own expert admitted, and this is an important point of the record, as their own expert admitted, once this information, once this product was launched, it would be immediately or instantaneously ascertainable by competitors and... Isn't there value for the launch, though? Being first to market, doesn't that give you some... Isn't there some value in that? Yeah, so this is the so-called head start argument that I think Novus made below. And the answer is there could be value in a head start, but that's not value that derives from secrecy. Again, not all information can be a trade secret. Just about any information can afford you a head start, but that doesn't make it a trade secret. The play in Strombeck was the exact same thing. The screenplay in Strombeck was the exact same thing. If somebody saw a movie that Strombeck produced, Strombeck had a head start. That person who saw that movie would need to recruit a cast, would need to film the movie, would need to edit the movie, would need to release the movie. Strombeck would have enjoyed a head start. Nonetheless, the Strombeck screenplay was not found to be a trade secret because it didn't have that secrecy qualification. Its value didn't derive from secrecy. So head start does not equal value derived from secrecy. Novus also made an argument on this point that the trade secret protects things with potential economic value. But here again, the term potential in the Trade Secret Act is there to account for a situation where somebody has a legitimate trade secret whose value hasn't been tapped yet but could be. So going back to the example of a manufacturing process. A manufacturing process that has been never used to make a commercial product has potential economic value in that it could be used. And it also gets trade secret protection because that value can be tapped without compromising its secrecy. Something with potential economic value whose value can only be tapped by a public dissemination, by a public disclosure like the Novus information does not qualify as a trade secret notwithstanding the term potential economic value in the trade secret statute. Time is up. Do you have any other questions, Judge Boggs? Thank you, Your Honor. Mr. Hart, you have five minutes. Thank you. I'd like to start with the issue that he finished with which is the issue of independent economic value. First of all, I don't believe the Strombeck decision as they're interpreting it and as the district court applied it reflects the law of the land as to what independent economic value potential or actual can be. I think here you look at a very different fact pattern whereas you had in Strombeck a poem and a playwright that was intentionally kept secret. It was just discussed with one or two other individuals at one point to get comments on it and then suddenly there's all these claims of copyright infringement and trade secret misappropriation and whatever else. This is quite different. What we have here is a situation where Novus goes to actuaries and they validate this product. They go through the pricing plan. The actuaries see, the actuaries being the group at Angen, they see what this is. They enter into an agreement with Novus for compensation and how they're all going to be paid once Nationwide or some other carrier deploys this product into the marketplace. What you call the actuaries, they're not involved in this litigation? They are not parties to this litigation. Are they not any of the names that we've been throwing around? The actuaries are the folks at Angen. Sorry? At Angen. They are Angen. That's an actuarial vendor for Nationwide. So if you have a new product that's financial and they evaluate it. That's what I call the three-cornered NDA happens. That's exactly right. If you look at those agreements, the ones between Angen and Novus, they're all about how are we going to get compensated for this? If this was, as they characterize it, just a marketing document or a marketing idea, you wouldn't have this. You wouldn't have a program for how you're going to have a royalty base that's paid in perpetuity, basically, if this is deployed into the marketplace and issued by a carrier. You wouldn't have a situation where you spend years finalizing this product, working with actuaries, and figuring out how are we going to get this in a package that works for a carrier. These are the types of things that match up with what's being said by the Seventh Circuit in the learning curve decision, where those things are actual economic value. They also reflect the potential economic value of this product. So to say this is exactly like what we saw in Strobbeck, I take it as a little disingenuous, because I think it's incongruent with the facts here, the time and effort that went into this. We also heard from opposing counsel that there was somehow a waiver because we didn't raise certain things about that Tiber was part of New Heights at the lower court. But remember, this isn't necessarily a waiver of an argument. What we're pointing the court to today is the facts that were before the lower court. Those facts are the exhibits that are saying Novus' product was being pitched to Nationwide as part of New Heights. So I don't think this is anywhere near sort of a new argument being raised post-trial or at trial after different arguments being raised at summary judgment. This is all part of that record. And finally, I think it's important to note that nearly everything we're hearing from the other side really boils down to fact issues. They're asking this court and effectively the lower court to prejudge all this and be the trier of fact. Whether or not there was a duty to maintain the secrecy held by the former Nationwide executives that went to Prudential is an issue of fact. Whether or not Novus' alleged trade secrets derive independent economic value based on the circumstances of this fact record are issues of fact. These are things that should be decided by a jury, not by a judge on summary judgment. If there's no further questions, I'll leave it at that. Okay, thank you. Thank you. Appreciate the arguments from both sides and the case will be submitted.